IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello

Civil Action No. 17-cv-02712-CMA

RAMONA L. SALAZAR,

    Plaintiff,

v.

NANCY BERRYHILL, Acting Commissioner of Social Security,

    Defendant.

---

**ORDER AFFIRMING THE DECISION OF THE ADMINISTRATIVE LAW JUDGE DENYING PLAINTIFF'S CLAIM FOR SOCIAL SECURITY INCOME**

---

This matter is before the Court on Plaintiff Ramona L. Salazar's appeal of the Commissioner's decision denying her claim for social security income (SSI). Exercising jurisdiction under 42 U.S.C. § 405(g), this Court affirms the decision of the Administrative Law Judge (ALJ).

## I.    BACKGROUND

Ms. Salazar applied for SSI on May 14, 2014. (Doc. # 11-2 at 15.) On October 12, 2016, following a hearing, an ALJ denied Ms. Salazar's claim, ultimately finding that she was not under a "disability" as defined in Title II of the Social Security Act. (*Id.* at 15–27.) Ms. Salazar appealed the ALJ's denial, and the Appeals Council denied her request for review, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 1–3.)

## II. STANDARD OF REVIEW

Judicial review of the ALJ's final decision is limited in scope by 42 U.S.C. § 405(g). "The court may not reweigh the evidence or try the issues de novo or substitute its judgment for that of the [ALJ]." *Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir. 1992). The district court may not reverse an ALJ simply because it may have reached a different result based on the record. *Ellison v. Sullivan*, 929 F.2d 534, 536 (10th Cir. 1990).

Instead, this Court's limited role is to determine whether the ALJ's decision is supported by substantial evidence. *Angel v. Barnhart*, 329 F.3d 1208, 1209 (10th Cir. 2003); *Trimiar*, 966 F.2d at 1328–29. "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007). A finding of "'no substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Trimiar*, 966 F.2d at 1329. Evidence is not substantial if it is overwhelmed by other evidence or if it is actually mere conclusion. *Williams v. Bowen,* 844 F.2d 748, 750 (10th Cir. 1988). Moreover, the record must show the ALJ considered all the evidence, but he need only discuss the evidence supporting his decision, along with any "uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Mays v. Colvin*, 739 F.3d 569, 576 (10th Cir. 2014); *Lykins v. Colvin*, 657 F. App'x 726, 727 (10th Cir. 2016)

Failure to apply the correct legal standard is also grounds for reversal. *Byron v. Heckler*, 742 F.2d 1232, 1235 (10th Cir. 1984). This Court must therefore determine whether the ALJ's action is consistent with the Social Security Act and the relevant regulations and case law. *Ellison*, 929 F.2d at 536.

However, not every error in evaluating evidence or applying the correct legal standard warrants reversal or remand. Courts may not reverse and remand for failure to comply with a regulation without first considering whether the error was harmless. *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004). The standard for harmless error requires a finding that, considering the evidence before the ALJ, the Court can "confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way." *Id.*; *see also Armijo v. Astrue*, 385 F. App'x 789, 792 (10th Cir. 2010); *Lynn P. v. Berryhill*, No. 17-CV-212-JFJ, 2018 WL 3142937, at *3 (N.D. Okla. June 27, 2018). Where the court "can follow the [ALJ's] reasoning in conducting [its] review, and can determine that correct legal standards have been applied, merely technical omissions in the ALJ's reasoning do not dictate reversal." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012)

### III.  LAW

"Disability" is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . . ." 42 U.S.C. § 423(d)(1)(A). The Act further provides that

> "[a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work

experience, engage in any other kind of substantial work
which exists in the national economy. . . ."

42 U.S.C. § 423(d)(2)(A). The claimant bears the burden of proving that he is disabled. 20 C.F.R. § 404.1512(a); *Wall v. Astrue*, 561 F.3d 1048, 1062 (10th Cir. 2009).

The Commissioner has established a five-step sequential evaluation process to determine whether a claimant is disabled. 20 C.F.R. § 416.920(a)(4). The steps of the evaluation are whether: (1) the claimant is currently working; (2) the claimant has a severe impairment; (3) the claimant's impairment meets an impairment listed in Appendix 1 of the relevant regulation; (4) the impairment precludes the claimant from doing her past relevant work; and (5) the impairment precludes the claimant from doing any work. *See* 20 CFR 404.1512(g), 404.1560(c), 416.912(g), and 416.960(c); *Pisciotta v. Astrue*, 500 F.3d 1074, 1076 (10th Cir. 2007). A finding that a claimant is or is not disabled at any point in the five-step evaluation process is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Serv.*, 933 F. 2d 799, 801 (10th Cir. 1991).

## IV. <u>ANALYSIS</u>

In this case, the ALJ proceeded through the first three steps in the sequential process. The ALJ concluded that Ms. Salazar (1) had "not engaged in substantial gainful activity at any time pertinent to this decision"; (2) suffered from "the following severe impairments: osteoarthritis of the lumbar spine; obesity; affective disorder; anxiety; and personality disorder"; and (3) did not have an "impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments." (Doc. # 11-2 at 17–18.)

4

Before addressing the fourth step, the ALJ assessed Ms. Salazar's residual functional capacity (RFC) and concluded that Ms. Salazar had the RFC to perform "less than the full range of light work as defined in 20 CFR 416.967(b)." (*Id.* at 20.) The ALJ added:

> [Ms. Salazar] can occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds. She can stand and walk for six hours total out of an eight-hour workday and sit for six hours total out of an eight-hour workday. Moreover, the claimant can occasionally bend, squat, and kneel. She cannot perform any complex tasks. Further, [Ms. Salazar] can perform unskilled jobs, with a SVP of two or less. She can occasionally deal with co-workers . . . [but she] cannot deal with the general public.

(*Id.* at 20–21.) At the fourth step, the ALJ determined Ms. Salazar had "no past relevant work." (*Id.* at 26.) Finally, at the fifth step, the ALJ concluded that "considering the [Ms. Salazar's] age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that [Ms. Salazar] can perform," including a production assembler, dry cleaner, and housekeeper/cleaner. (*Id.* at 26–27.)

On appeal, Ms. Salazar challenges the ALJ's assessment of several medical findings and opinions. Ms. Salazar specifically argues:

> ISSUE 1: The ALJ failed to weigh or assess Dr. Horsley's opinion concerning the effects of Ms. Salazar's headaches.
>
> ISSUE 2: The ALJ failed to correctly appreciate the extent of Dr. Horsley's treatment relationship with Ms. Salazar.
>
> ISSUE 3: The ALJ did not have proper reasons for rejecting some of Dr. Rodriguez's relevant mental limitations.

5

ISSUE 4: The ALJ gave great weight to Dr. Suyeishi's opinion but failed to account for all of his social limitations.

(Doc. # 14 at 4.) The Court addresses each of these contentions in turn, ultimately finding that none support a reversal or remand in this case.

### A. DR. JENNIFER HORSLEY

Dr. Jennifer Horsley was one of Ms. Salazar's treatment providers at Southern Colorado Family Medicine. (Doc. # 11-2 at 25.) She examined Ms. Salazar five times between August 2015 and July 2016. (Doc. ## 11-13 at 674–77; 704–08; 717-23; 11-14 at 855–59; 860–63.) On October 12, 2015, mid-way through their relationship, Dr. Horsley completed a Headache Questionnaire and Treating Source Statement for submission to the Social Security Administration on Ms. Salazar's behalf. (Doc. ## 11-6 at 190–91; 11-9 at 381–83.)

In response to questions set forth in the Headache Questionnaire, Dr. Horsley indicated that for the past seven years, Ms. Salazar had suffered from daily tension headaches of 1 to 2 hour duration. In describing the "typical headache event", Dr. Horsley checked that Ms. Salazar suffered visual disturbances, moderate pain, mood changes, and photosensitivity. (Doc. # 11-6 at 190.) In response to the question: "Would the patient be able to function on a job while the headaches occur?", Dr. Horsley responded "hard to concentrate." (*Id.* at 191.)

In the Treating Source Statement, Dr. Horsley opined that, based on Ms. Salazar's "asthma, hypothyroid, arthritis, fibromyalgia, PTSD, anxiety, [and] bipolar," Ms. Salazar was physically limited in that she could

- only lift/carry up to 10 pounds;

- sit for only 30 minutes at one time;

- sit for 4 hours total in an eight hour work day;

- be on her feet for less than 1 hour a day;

- rarely stoop, squat, crawl, or kneel; and

- rarely perform reaching, handling, or fingering activities.

(Doc. # 11-9 at 381–83.)

The ALJ did not state the weight given to the Headache Questionnaire completed by Dr. Horsley. The ALJ did, however, address the weight given to Dr. Horsley's Treating Source Statement; he gave it "no weight," reasoning

> there are no objective findings to support Dr. Horsley's limitations, and Dr. Horsley has not examined the claimant for three plus years. No weight is also given to Dr. Horsley's opinion as Dr. Horsley's limitations are inconsistent with the evidence indicating that although the claimant complained of joint pain, limited range of motion, and muscle aches, multiple physical examinations revealed full orientation; alertness; normal range of motion of the back, with no tenderness to palpation, no erythema, no edema, and no ecchymosis; full range of motion and no edema on extremities examination; normal neurological functioning; and a normal gait. (Exhibits 9F, pg. 36, 13F, pgs. 38, 97, & 100, and 21F, pg. 13).

(Doc. # 11-2 at 25–26.)

On appeal Ms. Salazar argues that the ALJ erred in (1) not addressing the weight he gave to the Headache Questionnaire, and (2) not properly appreciating Dr. Horsley's treatment relationship with Ms. Salazar when assessing the Treating Source Statement. Defendant agrees that the ALJ erred in both instances but nonetheless argues that the

7

errors were harmless.  Having thoroughly considered these issues and the applicable law, the Court finds (1) no error with respect to the Headache Questionnaire and (2) that any error with respect to the Treating Source Statement is harmless.

Although the ALJ did not mention the Headache Questionnaire, the Court finds that the ALJ was not required to do so.  The Headache Questionnaire was not an objective medical opinion.  Rather, it was a piece of evidence in the medical records reiterating subjective information supplied by Ms. Salazar.  In other words, Dr. Horsley was merely recording what Ms. Salazar told her, not opining about Ms. Salazar's medical condition based on Dr. Horsley's objective medical evaluation and testing.  Indeed, the Questionnaire contains quoted remarks, indicating that Dr. Horsley was quoting Plaintiff.  (Doc. # 11-6 at 191.)  It also states that the "headache condition" has been occurring for seven years, although Dr. Horsley had treated Ms. Salazar for only several months.  (*Id.*)  The Questionnaire contains additional information that could only be known to Ms. Salazar (particularly considering the infrequency with which Ms. Salazar received treatment from Dr. Horsley), such as what "ma[de] the headaches better" and "worse" and how often they occurred.  (*Id.* at 190–91.)

Moreover, the ALJ "need only discuss "uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Mays*, 739 F.3d at 576.  The headache evidence was neither uncontroverted nor significantly probative.  Although Ms. Salazar submitted some medical evidence reflecting that she complained of headaches to her treatment providers, the vast majority of evidence reflects that she did not suffer from headaches, including reports from Southern Colorado Family

Medicine, her main treatment source, wherein Ms. Salazar denied experiencing headaches at virtually every visit. (Doc. # 11-13 at 731–90.) Ms. Salazar also testified before the ALJ that she suffers from headaches, but the ALJ found her pain descriptions "not entirely consistent with the medical evidence or other evidence in the record" (Doc. # 11-2 at 21), and Ms. Salazar does not challenge that finding. Moreover, Ms. Salazar did not include "headaches" as a condition or issue in her disability report. (Doc. # 11-6 at 143–50.) Nor does she point to any evidence in the record on appeal that is consistent with her experiencing a debilitating headache condition.

Further, Dr. Horsley's own treatment records directly controvert that Ms. Salazar was suffering from a "headache condition." Dr. Horsley saw Ms. Salazar in August 2015, October 2015, March 2016, April 2016, and July 2016. Treatment notes from each of these meetings reflect that Ms. Salazar suffered from "no headache[s]." (Doc. ## 11-13 at 674, 677, 704, 707, 17, 720, 722; 11-14 at 855, 859, 860, 863.) Indeed, Dr. Horsley's records reflect that Ms. Salazar was receiving treatment for a thyroid issue, nocturnal hypoxia, obesity, a vitamin D deficiency, an upper respiratory infection, anxiety, seasonal allergies, and hemorrhoids; they contain no mention of a head condition or tension headaches in the entire year that Dr. Horsley treated Ms. Salazar. (Doc. ## 11-13 at 674, 704, 717; 11-14 855, 860.)

Accordingly, based on a review of the entire medical record and the ALJ's findings thereon, the Court finds that the ALJ was not required to discuss the Headache Questionnaire, much less assign it any weight. The Court therefore finds no error.

With respect to Ms. Salazar's second challenge—to the ALJ's assessment of her relationship with Dr. Horsley—the Court finds that reversal is not warranted because any perceived error is harmless. The ALJ's failure to recognize that Dr. Horsley had seen Ms. Salazar within the year before the ALJ issued his decision would not have altered the outcome of Ms. Salazar's case. The ALJ clearly articulated his reasons for according Dr. Horsley's Treating Source Statement no weight—namely, Dr. Horsley's recommended limitations were "inconsistent" with the evidence in the record and there are no objective findings to support them. These reasons are substantially supported. Numerous physical examinations reflect, among other things, that Ms. Salazar had a full range of motion of the back, no tenderness to palpation, and a normal gait. (Doc. ## 11-9 at 358; 11-13 at 708, 732, 766, 770.) More importantly, Dr. Horsley's own treatment notes directly contradict her Treating Source Statement. The notes consistently state that Ms. Salazar is suffering from "no back pain," exhibited a normal range of musculoskeletal motion, had normal strength and sensation, and no edema in her extremities. Dr. Horsley's treatment notes mention no functional or postural limitations, nor was Ms. Salazar even seeing Dr. Horsley for musculoskeletal issues. Although some records reflect that Ms. Salazar complained of chronic back pain and had shoulder surgery in 2015, records from March 2016 state that Ms. Salazar "graduated from orthopedic visits," that her "pain improved," and that she became "much more functional." (Doc. # 10-13 at 674.) Ms. Salazar's Function Report also states that she does laundry, cleans the house, walks, and shops without trouble—suggesting she is significantly more capable than Dr. Horsley's Treating Source

10

Statement opines. (Doc. # 11-6 at 153–55.) That the ALJ incorrectly stated Dr. Horsley had not seen Ms. Salazar in three years does not necessary mean that he did not view Dr. Horsley as a treating physician, nor does it nullify the ALJ's additional reasons for discounting Dr. Horsley's opinions. In other words, had the ALJ appropriately articulated Dr. Horsley's recent treatment of Ms. Salazar, his decision would not have changed.

The Court therefore finds that any error in the assessment of Dr. Horsley's opinion was harmless and reversal is not warranted.

### B. DR. CARLOS RODRIQUEZ

Dr. Carlos Rodriquez, a consultative examiner and licensed psychologist, examined Ms. Salazar once—on April 28, 2016. (Doc. # 11-14 at 847.) As pertinent here, Dr. Rodriquez opined that Ms. Salazar was "at least marked[ly]" impaired in seven of twenty areas of mental functioning; moderately to markedly impaired in five areas; slightly or moderately to slightly impaired in four areas, and moderately impaired in four areas. (*Id.* at 852–53.) Ms. Salazar's challenge relates only to Dr. Rodriquez's moderately impaired findings, which are: Ms. Salazar's ability to remember locations and work-like procedures, to understand and remember short and simple instructions, to respond appropriately to changes in the work setting, and to set realistic goals or make plans independently of others. (*Id.*)

The ALJ assigned "very minimal weight" to Dr. Rodriquez's overall opinion. (Doc. # 11-2 at 26.) The ALJ then briefly explained the opinion, including all limitations. He concluded by explaining that the ALJ's "marked limitations . . . are neither well

supported nor consistent with the medical evidence of record as a whole." (*Id.*)  Ms. Salazar argues that the ALJ should have also provided express reasons for minimally weighing the four "moderate limitations" and that the failure to do so is reversible error. Defendant disagrees, arguing (1) that the ALJ was not required to give specific reasons with respect to the moderate findings, and (2) regardless, any error is harmless.

The Court finds that any perceived error, to the extent there was one, was harmless and reversal is not warranted.  To begin, it is clear to this Court that the ALJ considered and incorporated some, but not all, of Ms. Salazar's moderate limitations into his evaluation.  Indeed, at step three of the evaluation process, the ALJ stated that Ms. Salazar had "moderate difficulties" with regard to "concentration, persistence, or pace," adding that Ms. Salazar had "moderate limitations" in "sustaining focus, attention, and concentration sufficiently long enough to permit the timely and appropriate completion of tasks commonly found in work settings" and in "working independently, appropriately, and effectively."  (Doc. # 11-2 at 19.)  It is also clear from the ALJ's denial that he considered Dr. Rodriquez's moderate limitation recommendations with respect to Ms. Salazar's memory, understanding, and judgment, but assigned them minimal weight due to inconsistencies in the record.  Indeed, when addressing Dr. Rodriquez's opinion, the ALJ cited to numerous portions of the record that contradicted Dr. Rodriquez's proposed limitations, including:

- Medical treatment records from June 2014 and January 2015, stating that Ms. Salazar's judgment, mental status, and affect were "normal" (Doc. ## 11-8 at 286; 11-13 at 772);

12

- Counseling treatment records from Spanish Peaks from May 2013 to July 2014 describing Ms. Salazar as alert and fully oriented, with coherent and logical thought processes, no "flight of ideas," no loose associations or tangential thinking, an "intact" remote memory, and "average" intelligence (Doc. # 11-8 at 304–07);
- Counseling treatment records from Spanish Peaks from July 2014 through March 2016 again detailing that Ms. Salazar's thought processes were "coherent, logical, and goal directed"; she has "fair" judgment and "no current impairment" in her attention or concentration; and her memory is "intact" (Doc. # 11-14 at 799–846); and
- Dr. Rodriquez's own evaluation report describing that Ms. Salazar "does not present with any evidence of loose associations, flight of ideas, rapid thinking, or preservation" and indicating "the presence of intact attention, calculation, and working memory capabilities" (Doc. # 11-14 at 848).

That the ALJ expressly mentioned only "marked" limitations when explaining his reasoning does render his entire assessment of Dr. Rodriquez's opinion unsupported. The Court can easily follow the ALJ's reasoning. The ALJ clearly stated the weight he assigned to the overall opinion, and the ALJ thoroughly cited to portions of the medical evidence conflicting with Dr. Rodriquez's proposed moderate limitations.

Thus, based on the information that the ALJ reviewed and reiterated, the Court finds that "no reasonable administrative factfinder . . . could have resolved the factual matter in any other way." See *Allen*, 357 F.3d at 1145. The ALJ's failure to expressly

state his reasoning for minimally weighing Dr. Rodriquez's proposed "moderate" limitations was little more than a harmless technical omission that did not affect the outcome of the case and does not dictate reversal. *See Keyes-Zachary*, 695 F.3d at 1167 (Although the more comprehensive the ALJ's explanation, the easier this Court's task, the Court "cannot insist on technical perfection . . . . The ALJ "need not make a 'formalistic factor-by-factor recitation of the evidence[,]' [s]ee Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000), [because] common sense, not technical perfection, is our guide.").

### C. DR. MARK SUYEISHI

Dr. Mark Suyeishi, a nonexamining agency psychological consultant, reviewed the medical evidence in the record and completed a Mental Residual Functional Capacity Assessment (MRFCA). The MRFCA contains findings that Ms. Salazar had some exertional, postural, understanding, memory, concentration, persistence, and social limitations. (Doc. # 11-3 at 62–69.) The ALJ accorded Dr. Suyeishi's opinion "great weight," (Doc. # 11-2 at 24–25), and Ms. Salazar does not object to that finding. Ms. Salazar instead contends that the ALJ erred in that the RFC does not account for each of Dr. Suyeishi's specific limitation findings from section I of the MRFCA, in particular Dr. Suyeishi's notation that Ms. Salazar has a "moderate limitation" in her ability to "accept instructions and respond appropriately to criticism from supervisors."

The Court perceives no error. The Tenth Circuit has made clear that, "[h]aving adopted the limitations described in section III of the MRFCA, the ALJ is not also required to specifically adopt or discuss each individual limitation described in section I."

14

*Lee v. Colvin*, 631 F. App'x 538, 542 (10th Cir. 2015).  In section III of the MRFCA, Dr. Suyeishi opined that Ms. Salazar should have "limited interpersonal contact," later adding that Ms. Salazar should have "limited interaction with co-workers and the public." (Doc. # 11-3 at 69–70.)  The ALJ then included this social limitation in Ms. Salazar's RFC, stating that Ms. Salazar "can occasionally deal with co-workers . . . [and] cannot deal with the general public."  (Doc. # 11-2 at 21.)  The ALJ also limited Ms. Salazar to unskilled work, which relates primarily to "working with things (rather than with data or people)."  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 202.00(g); *Conkle v. Astrue*, 487 F. App'x 461, 462 (10th Cir. 2012).

Ms. Salazar disagrees that the ALJ's RFC sufficiently incorporated Dr. Suyeishi's opinions because, he argues that, "unskilled work" requires her to "submit to supervision" and "respond appropriately to [it]," which, according to Dr. Suyeishi's section III findings, she cannot do.   (Doc. ## 14 at 20; 18 at 8–9.)  Ms. Salazar grossly overstates Dr. Suyeishi's findings.  He did not opine that Ms. Salazar could never "submit to supervision" or respond appropriately to supervisors; he opined that she was "moderately impaired" in her ability to accept instructions and respond appropriately to criticism, while simultaneously making findings suggesting that Ms. Salazar could, indeed, work appropriately under supervision, including that she was not limited in her ability to "ask simple questions or request assistance" or "maintain socially appropriate behavior."  (Doc. # 11-3 at 68.)  Combining these findings, Dr. Suyeishi concluded that Ms. Salazar should have "limited interpersonal contact."  (Doc. # 11-3 at 68–70.)

Nothing in his evaluation suggests that Ms. Salazar cannot submit to supervision under any circumstances.

In addition, all the jobs identified by the ALJ at step five—dry cleaner, production assembler, and housekeeper—note that "taking instructions" and "helping" is not a "significant" part of the job. See DOT No. 323.687-14; No. 302.685-010; No. 707.687-010. Thus, even if the ALJ had included in the RFC a separate limitation for "taking instructions" or "responding to criticism from supervisors," the outcome of Ms. Salazar's disability finding would not have changed, rendering any possible error harmless.

Thus, the Court finds that the ALJ's assessment and incorporation of Dr. Suyeishi's opinion into Ms. Salazar's RFC and ultimate disability determination does not constitute reversible error.

## V. CONCLUSION

For the foregoing reasons, the decision of the ALJ denying Plaintiff Ramona Salazar's request for disability benefits is AFFIRMED.

DATED: July 19, 2018　　　　　　　　　　BY THE COURT:

　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　CHRISTINE M. ARGUELLO
　　　　　　　　　　　　　　　　　　　　United States District Judge